UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


CHARLIE FLOYD                                                    PLAINTIFF


VS.                                 CIVIL ACTION NO. 3:04CV78TSL–JCS


AMITE COUNTY SCHOOL DISTRICT,
AMITE COUNTY SCHOOL BOARD; JOHN
DAVIS, IN HIS OFFICIAL CAPACITY
AND INDIVIDUAL CAPACITY; BEACHUM
WILLIAMS,IN HIS OFFICIAL AND
INDIVIDUAL CAPACITY, MARY RUSS, IN
HER OFFICIAL AND INDIVIDUAL CAPACITY
AMITE COUNTY SCHOOL DISTRICT, ET AL.               DEFENDANTS


MEMORANDUM OPINION AND ORDER

     This cause is before the court on the motion of defendants

Amite County School District, the Amite County Board of Education,

John Davis, Beachman Williams and Mary Russ for summary judgment.

Plaintiff Charlie Floyd has responded in opposition to the motion

and the court, having considered the memoranda of authorities,

together with attachments, submitted by the parties, concludes

that the motion should be granted.

     Plaintiff Charlie Floyd, who is black, filed this action

under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et

seq.,[1] alleging he was discharged from his position as principal

_____

     [1]   Among other bases for summary judgment, defendants
argued in their motion that plaintiff's Title VII claim must be
dismissed because he did not timely file his charge of
discrimination.  Plaintiff responded, claiming his charge was
timely filed, but arguing further that regardless of whether he is
barred from pursuing his Title VII claim, his race discrimination

of Amite County High School (ACHS) for reasons of race.  He sued the School District and School Board, District Superintendent Mary Russ and two members of the Board, John Davis and Beachman Williams, alleging that Russ, acting in concert and conspiracy with the School Board and/or certain Board members including Davis and Williams, all of whom are black, conspired to cause him to be discharged because they objected to his having allowed white students from a local private school to use the ACHS track facilities.  In addition to his Title VII claim, Floyd alleged state law claims for breach of contract and bad faith termination, negligent and or intentional infliction of emotional distress, civil conspiracy, defamation, tortious interference with contract

---

claim is viable under § 1981 because the timeliness of his EEOC charge has no bearing on his § 1981 claim.  In reply, defendant denies that plaintiff has pled a claim under § 1981.  The facts claimed to support plaintiff's putative § 1981 claim are the same as the facts that are the basis of his Title VII claim, and plaintiff's complaint does include a reference to § 1981 in the prayer for relief.  However, whereas plaintiff delineated each of his causes of action under a separate heading in the complaint and included a cause of action for violation of Title VII, he did not purport to set forth a cause of action for violation of § 1981 nor mention § 1981 anywhere but in his prayer for relief.  In the court's opinion, plaintiff has not pled a claim for relief under § 1981.  However, even assuming for the sake of argument that he had adequately pled such a claim, for reasons explained herein, he cannot succeed on any such putative claim.

and trespass to chattels.[2]  Defendants have moved for summary judgment on each of plaintiff's claims.

Background

The following facts are undisputed.  During September 2002, Superintendent Mary Russ initiated an investigation into allegations of irregularities or improprieties concerning Floyd, then principal of ACHS.  By letter dated October 11, 2002, Russ notified Floyd that he was suspended from duty pending the outcome of the investigation, and ultimately, on November 10, 2002, Superintendent Russ notified Floyd a decision had been made to terminate his employment.  Russ cited a number of reasons for this decision, as follows:

1. improper handling of tobacco violations by students, including charging students a $75 fine, suspending such students until the fine was paid, and failing to account for monies received despite repeated requests by the superintendent's office;

2. inaccuracies, obliterations and additions in students' cumulative records;

3. removal of physical science courses from the curriculum without authorization;

---

[2]  Although the majority of his claims are based directly on his termination and events leading to his termination, the claim for trespass to chattels is based on Floyd's allegation that following his termination, Russ entered his personal office and caused his personal effects, including awards and photographs, to be discarded or destroyed.

4. holding track and field events on school property without explaining the details of such events to the Board;

5. failure to fulfill his duties as principal by spending an inordinate amount of time on activities unrelated to his contractual duties; and

6. failure to complete student schedules for the 2002-2003 school year in a timely fashion.

Floyd requested a due process hearing before the School Board pursuant to Mississippi Code Annotated § 37-9-59, which was conducted by an independent hearing officer over a four-day period in late March 2003.  In June 2003, the hearing officer presented the School Board with the hearing transcripts, exhibits, and a summary of the evidence adduced at the hearing.  On July 11, 2003, the School Board issued its opinion finding that Floyd's dismissal was a proper employment decision and was not contrary to law.  On appeal by Floyd, the Amite County Chancery Court ruled in Floyd's favor, reversing the Board's decision upon finding it was not supported by substantial evidence.  However, the School Board appealed to the Mississippi Court of Appeals, which reversed the chancellor, finding that there was sufficient evidence to support three of the claimed bases for Floyd's discharge (items numbered 1, 2 and 6 in Russ's letter).  Floyd filed a petition for writ of certiorari to the Mississippi Supreme Court, which was denied on August 3, 2006.

Title VII

Defendants seek summary judgment on Floyd's Title VII claim, arguing that (1) the claim is statutorily time barred because Floyd did not file his EEOC charge within 180 days of the alleged discriminatory act; and (2) because plaintiff cannot prove the elements of his claim in any event.

In order to file suit under Title VII, a plaintiff first must file a charge with the EEOC within 180 days of the alleged adverse employment decision.  See 42 U.S.C. § 2000e-5(e)(1).  An employee who claims to be the victim of a racially motivated employment decision "is put on notice that his rights have been violated at the time the adverse employment decision occurs, and must therefore bring the claim within 180 days of the adverse decision."  Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 352 (5th Cir. 2001).

It is undisputed that Floyd was at first suspended from his job duties on October 10, 2002, and then was terminated from his position by the superintendent on November 15, 2002.  At the time of his suspension and termination, Floyd believed he had been discriminated against on the basis of race.  Yet Floyd did not file an EEOC charge within 120 days of either his suspension or termination.  Rather, he filed his charge on October 9, 2003, 364 days after his suspension, and 328 days after his termination. Notwithstanding this, Floyd maintains his EEOC charge was timely

because it was filed within 180 days of July 11, 2003, the date on which the School Board voted to approve his termination.  However, "[T]he pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period."  Del State College v. Ricks, 449 U.S. 250, 258, 101 S. Ct. 498, 506, 66 L. Ed. 2d 431 (1980).  While Floyd contends that the Board's decision to uphold the superintendent's termination decision was also racially discriminatory, the fact is, the challenged adverse employment action was his termination. Accordingly, the court concludes that Floyd's Title VII claim is untimely.

Even if Floyd's claim were not barred for this reason, he still could not prevail on his race discrimination claim under Title VII.  Title VII provides that it is an "unlawful employment practice for an employer ... to discriminate against any individual ... because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  In this action, Floyd does not claim he was terminated because he is black.  Rather, he alleges he was terminated because he allowed white private school students to participate in a summer track program held at the majority-black ACHS.  According to Floyd, his attempt to bridge Amite County's racial divide by allowing white student athletes from the predominantly white Centerville Academy to participate in the Southwest Mississippi Roadrunners summer track program to be held

6

at the track facilities of ACHS School was not well received by certain black administrators of the Amite County School District. He alleges that in response to his inclusion of these white private school students in his summer track program, Board President John Davis conspired with Board member Beachman Williams and Interim Superintendent Mary Russ to have him removed as principal of ACHS.[3]

Given that Floyd does not allege he was discriminated against because he is black, he cannot establish a claim for "race discrimination" under Title VII or § 1981.  See Pittman v. General Nutrition Corp., 515 F. Supp. 2d 721, 745 (S.D. Tex. 2007) (dismissing Title VII/§ 1981 claim that the plaintiff was discriminated against because of his race, and stating, "[N]one of Pittman's evidence, even viewed in the light most favorable to his claims, suggests . . . that GNC's allegedly all-White management

---

[3]     In his complaint, Floyd alleges:
        During the summer of 2003, in his time away from his employment, Coach Floyd assisted Caucasian student-athletes from area private schools on the ACHS school grounds.
        Coach Floyd avers that ACSB president John Davis objected to Coach Floyd allowing Caucasian children from the private schools using public track facilities intended for the African-American students and took actions, including but not limited to conspiring with Mary Russ, to have coach Floyd terminated as principal.
        Coach Floyd avers that the decision of the ACSB president, John Davis, and possibly others to have him terminated was the product of racial animus toward Coach Floyd resulting from assisting the Caucasian student-athletes.

intentionally discriminated against him because he is White, and not a person 'of color.'"); see also Burlington N. & S.F.R. Co. v. White, 548 U.S. 53, 63, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (explaining that "[t]he substantive provision (of Title VII) seeks to prevent injury to individuals based on who they are, i.e., their status [whereas] [t]he anti-retaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct").

Floyd's claim is better viewed as a variety of "associational discrimination," or of retaliation.  In effect, he alleges he was fired in retaliation for allowing white private school students to use the track facilities at ACHS.  See Pittman, 515 F. Supp. 2d at 746 (associational discrimination claim by white plaintiff based on charge he was discriminated against because of his advocacy of black man for promotion, was "functionally indistinguishable in large part from Pittman's retaliation claims").  Regardless of how it is characterized, the claim cannot succeed.

While the Fifth Circuit has found claims of "associational discrimination" based on certain interpersonal relationships to be actionable under Title VII and/or § 1981, here, Floyd had no "relationship" with the white students in the track program.  In Pittman, supra, the white plaintiff alleged an offer of promotion had been rescinded because he supported a black man, Demke, for another position.  The court concluded he failed to assert a

cognizable claim for "associational discrimination" because he had no relationship with Demke.  The court wrote:

> Insofar as Pittman intends to argue that the protected "association" was some social relationship with Demke, . . . the Court concludes that the claim is legally insufficient.  In the Fifth Circuit, Title VII and § 1981 prohibit employers from discriminating against an employee on the basis of certain interpersonal relationships related to the employee's race.  <u>See Deffenbaugh-Williams v. Wal-Mart Stores, Inc.</u>, 156 F.3d 581, 589 (5th Cir. 1998), <u>rev'd in part</u>, 169 F.3d 215 (5th Cir. 1999), <u>reinstated in relevant part on reh'g en banc</u>, <u>Williams v. Wal-Mart Stores, Inc.</u>, 182 F.3d 333 (5th Cir. 1999) ("In sum, Title VII prohibits discrimination in employment premised on an interracial relationship." (collecting authorities)).  GNC argues that only marital or other intimate relationships are protected, but the point is academic.  *Pittman has not proven or even asserted that he and Demeke had any sort of "relationship."*  Pittman certainly was acquainted with and had supervised Demeke, which was the basis of his allegedly high opinion of Demeke's job performance.  But, there is no indication that the two had a personal, social or intimate friendship, or that they even had worked closely together.  Assuming arguendo that non-intimate relationships enjoy statutory or constitutional protection, which is a serious question, *Pittman has not established that he and Demeke had any relationship that would constitute protected "association."  Pittman has failed to establish a critical element of this form of his associational discrimination claim, and summary judgment is appropriate on this theory as well*.

<u>Pittman</u>, 515 F. Supp. 2d at 746 (emphasis added).  Likewise, Floyd had no personal "relationship," intimate or otherwise, with the white track students.  Moreover, he does not even allege he was fired because he "associated with" the white students, but rather simply because he allowed white students from a private school to use the defendant school district's facilities.

Floyd's claim is not cognizable as a retaliation claim under Title VII or § 1981.  To the extent Floyd claims he was retaliated against for allowing white students to participate in the track program at ACHS, his claim fails.  To establish a claim for retaliation under Title VII or § 1981, a plaintiff must show that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse action.  Mota v. Univ. of Tex. Houston Health Sci. Ctr., 261 F.3d 512, 519 (5th Cir. 2001).  See also Foley v. Univ. of Houston Sys., 324 F.3d 310, 316 (5th Cir. 2003) (the elements for establishing a prima face case of retaliation under § 1981  are identical to those that must be established under Title VII).  The Fifth Circuit has defined "protected activity" under Title VII as "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 385 (5th Cir. 2003) (citation omitted).  Floyd does not allege that he was terminated for engaging in any such protected activity.

Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  The Supreme Court has recently affirmed that § 1981 encompasses claims of retaliation.

10

*CBOCS West, Inc. v. Humphries*, 128 S. Ct. 1951, 1958 (2008).  The Court did not expressly address the kind of "protected activity" that will support a § 1981 claim, but did hold that § 1981 encompasses the claim of "an individual (black or white) who suffers retaliation because he has tried to help a different individual, suffering direct racial discrimination, secure his § 1981 rights."  128 S. Ct. at 1958.  Other courts have been explicit:

> While § 1981 may well incorporate Title VII's protections for both oppositional and participatory protected activity engaged in by a white plaintiff, courts have recognized that the opposition clause of Title VII "is not identical to the kind of discrimination proscribed by § 1981."  At a minimum, courts agree that *an act of retaliation for engaging in activity protected by Title VII "does not give rise to a claim for retaliation that is cognizable under § 1981 unless that activity was also protected by § 1981."*  Unlike Title VII, the pertinent part of § 1981 prohibits only purposeful racial discrimination in the making and enforcing of contracts.

*Welzel v. Bernstein*, 436 F. Supp. 2d 110, 118-19 (D.D.C. 2006) (citations omited).  *See also Cleveland v. Union General Hosp.*, Civil Action No. 07-00119, 2007 WL 4693806, 4 (W.D. La. Nov. 14, 2007) (holding that "to satisfy the first prong of a prima facie case for retaliation under § 1981, plaintiff must demonstrate with some particularity that she attempted to vindicate the rights that are implicated by § 1981").[4]

---

[4]The court in *Cleveland* wrote:
[C]ourts have held that § 1981 protects activities engaged in to vindicate the § 1981 rights of racial

11

What Floyd would claim as the "protected activity" in which he engaged is having invited white students from the local private school to use the track facilities at ACHS.  However, as this is not a claim that Floyd attempted to vindicate any right of these white students to be free from racial discrimination in the making and enforcement of any contract, Floyd cannot make out a cognizable § 1981 retaliation claim.[5]  For these reasons, the court concludes that Floyd's claim under Title VII and any putative claim under § 1981 must be dismissed.

---

minorities, such as opposition to racially discriminatory employment practices.  However, the § 1981 "rights being vindicated by white plaintiffs must be identified with some particularity in order to limit actions under that statute to its purpose.  Otherwise, non-minority plaintiffs could bring actions where Section 1981 rights are not implicated."  Thus, to satisfy the first prong of a prima facie case for retaliation under § 1981, plaintiff must demonstrate with some particularity that she attempted to vindicate the rights that are implicated by § 1981.

Cleveland v. Union General Hosp., Civil Action No. 07-00119, 2007 WL 4693806, 4 (W.D. La. Nov. 14, 2007).

[5]     The court in Pittman v. General Nutrition Corp., under comparable circumstances, wrote that "[a]nother conceivable § 1981 advocacy theory might have been that [the defendant] violated [the plaintiff's] First Amendment right to express his views."  515 F. Supp. 2d 721, 747 n.13.  However, as the plaintiff had not "even hinted that he intend[ed] to assert a First Amendment claim under § 1981 or otherwise," and as it was "far too late for [t]he plaintiff] to amend his claims," the court did not consider the viability of any such claim.  So, too, here, Floyd might have attempted to bring his claim as a First Amendment retaliation claim under § 1981.  However, there is no arguable basis for concluding that he attempted to do so, and at this late date, he would not be permitted to amend to assert such a claim.

Even if that were not so, defendants have also argued that Floyd's Title VII claim (and any putative § 1981 claim) fails as a matter of law both because he cannot establish the elements of his prima facie case and because he cannot prove that the reasons set forth by defendants for his termination were pretext.  Assuming for the sake of argument that plaintiff had stated a cognizable claim, and assuming, as well, for the sake of argument, that plaintiff had presented sufficient evidence in support of his prima facie case of discrimination and/or retaliation, the court, having thoroughly reviewed the record and considered the parties' arguments, concludes that Floyd has failed to present sufficient evidence to impugn defendants' explanation of the reason(s) for his termination.

Under both Title VII and § 1981, a plaintiff can prove a claim of intentional discrimination or retaliation by either direct or circumstantial evidence.  Staten v. New Palace Casino, LLC., 187 Fed. Appx. 350, 361, 2006 WL 1737438 (5th Cir. 2006) (citing Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000) (intentional discrimination); Septimus v. Univ. of Houston, 399 F.3d 601, 608 (5th Cir. 2005) (retaliation)).  Direct evidence is "evidence which, if believed, proves the fact [in question] without inference or presumption." Fabela v. Socorro Indep. School Dist., 329 F.3d 409, 415 (5th Cir. 2003).  "If a plaintiff presents direct evidence of discrimination, he is

13

allowed to bypass the burden-shifting analysis used in circumstantial evidence cases." <u>Fullen v. Galveston Independent School Dist.</u>, Civil Action No. G-07-0194, 2008 WL 2491655, 5-6 (S.D. Tex. June 18, 2008).

In the case at bar, Floyd has presented evidence of certain statements by defendant Davis which he contends constitute direct evidence of a discriminatory/retaliatory animus.  In particular, Floyd has presented affidavits from Hirschel and Celia Pearson relating a conversation with defendant Davis in which Davis told them Coach Floyd had no business having white private school students participating in the summer track program at ACHS.  Floyd has also testified that Davis remarked to him prior to the School Board hearing that "they did not want them white kids over there at Amite County High School.  Coach, you know better. . . ." Although Davis denies having made these statements, the court, for purposes of deciding this motion, assumes that he did.  However, this evidence does not show that the challenged employment decision was motivated by race or retaliation.  Even if one could reasonably infer from these alleged statements that Davis's own vote to approve the superintendent's termination decision was motivated, at least in part, by his disapproval of Floyd's actions in having allowed white private school students to participate in the summer track program at ACHS, contrary to plaintiff's urging, Davis's alleged statements do not tend to establish that any other

14

member or members of the School Board harbored racial or
retaliatory animosity,[6] and certainly they do not tend to show
that Russ's decision to terminate Floyd's employment was
influenced by Floyd's inclusion of white students in the track
program.

The Fifth Circuit has held that "[w]hen a person or persons
with decision making authority evinces racial animus that may
constitute direct evidence of discrimination." Jones v. Robinson
Prop. Group, L.P., 427 F.3d 987, 993 (5th Cir. 2005). "Oral
statements constitute evidence of discrimination if they indicate
[an impermissible] animus and the speaker is principally
responsible for the plaintiff's firing." Sandstad v. CB Richard
Ellis, Inc., 309 F.3d 893, 899 (5th Cir. 2002) (citing Russell v.
McKinney Hospital Venture, 235 F.3d 219 (5th Cir. 2001)). See
also id. ("We have held that a remark may bear a sufficient causal
connection to the employment decision if the speaker has such
influence over the decision maker that his animus properly may be
imputed to the decision maker.") (citing Russell, 235 F.3d at
226-27); Laxton v. Gap, Inc., 333 F.3d 572, 583 (5th Cir. 2003)
(comment must "be made by a person primarily responsible for the

---

[6]     Floyd claims Davis stated that "*they* did not want them
white kids over there at Amite County High School." Davis did not
indicate who "they" were. Floyd merely assumes that Davis was
referring to Board members, or perhaps some of the Board members;
and even then, he does not suggest on what basis Davis professed
to know that "they" thought.

adverse employment action or by a person with influence or leverage over the formal decision-maker"). Here, Davis was not *the* decision maker or "principally responsible" for plaintiff's termination. He was one member of a five-member board, who could have accomplished nothing on his own. In a similar case, <u>Russell v. University of Texas of the Permian Basin</u>, the plaintiff relied on discriminatory remarks made by the chair of a selection committee. Even though there was some suggestion that the chair "did [Plaintiff] in" regarding her non-selection for the available position, the Fifth Circuit held that the alleged discriminatory remarks were not sufficient to avoid summary judgment because the plaintiff

> presented no competent summary judgment evidence that [the committee chair] exercised influence over any of the other decisionmakers . . ., namely, the other committee members . . . . The six-person search committee unanimously selected Dr. Richardson as their choice to fill the tenure-track position. . . . Without any evidence that [the chair] influenced the committee, [the Court] cannot impute [the chair's] allegedly discriminatory animus to the committee's selection.

234 F. App'x 195, 2007 WL 1879157, at *6 (5th Cir. 2007). Here, there is no evidence that Davis exercised influence over Russ or his fellow Board members regarding Floyd's termination.

Cases in which the plaintiff has no direct evidence of discrimination and the plaintiff therefore relies on circumstantial evidence to prove his claim are analyzed under the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v.</u>

16

Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).
Id.  Under the McDonnell Douglas framework, the plaintiff must
first establish a prima facie case of discrimination or
retaliation.  Staten, 187 Fed. App'x. at 357, 2006 WL 1737438, at
5-6 (citations omitted).  If the plaintiff makes a prima facie
showing, a presumption of discrimination or retaliation arises and
the burden of production shifts to the defendant to articulate a
legitimate, nondiscriminatory or nonretaliatory reason for its
employment action.  Id.  The employer's burden is only one of
production, not persuasion, and involves no credibility
assessments.  Id.

     If the defendant meets this burden of production, the
presumption of discrimination created by the plaintiff's prima
facie case disappears, and the burden shifts to the plaintiff to
produce evidence capable of meeting the ultimate burden of
persuasion on the issue of intentional discrimination or
retaliation.

     Where the issue is discrimination, if the employer meets its
burden of production, the burden shifts to the plaintiff to show
defendants' reason(s) to be pretextual or part of a "mixed
motive."  Gillaspy v. Dallas Indep. School Dist., No. 06-11204,
2008 WL 2037257, 5 (5th Cir. May 13, 2008) (citing Rachid v. Jack
in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004).  "It appears,
but is not certain, that plaintiffs in the Fifth Circuit may also

17

proceed under a mixed-motive theory in retaliation cases." <u>See</u> <u>BroLE00136902+ckington v. Circus Circus Mississippi</u>, 2008 WL 2079130, (N.D. Miss. May 15, 2008). This means the plaintiff must show "either (1) that the defendant's reason is not true, but instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive alternative)." <u>Id.</u> (internal citations omitted).

In this case, defendants have articulated legitimate, nondiscriminatory/nonretaliatory reasons for Floyd's termination. In fact, not only have defendants articulated these reasons, but on appeal of the School Board's ruling approving the superintendent's termination decision, the Mississippi Court of Appeals has found there was substantial evidence supporting Floyd's dismissal, and concluded that "the school board was justified in discharging Floyd for a number of reasons," including his improper handling of tobacco violations;[7] his having signed a

---

[7]   The court cited evidence that under Floyd's administration, students had been charged $75 for tobacco violations, notwithstanding that District policy only permitted the imposition of fines for overdue library books and otherwise limited the range of permissible punishments for tobacco violations to in- and out-of-school suspension. Although Floyd maintained that he had been instructed to impose such fines by the former superintendent, Bobby Whittington, the court observed that such fines were not authorized by the School District's policy manual and noted that Superintendent Russ had testified that none of the District's other principals understood there to be a policy

number of students' permanent records certifying them for
graduation when the records should not have been certified and his
having allowed and/or failed to correct numbers of other errors in
student records;[8] and his failure to complete student schedules in
a timely manner.[9]  And while Floyd has attempted to explain his
actions, he does not dispute the facts underlying these reasons

---

allowing such fines.  The court also observed that the problem was
"exacerbated" by the fact that Floyd could not account for the
monies collected as fines.

[8]    The court cited testimony from an employee of the State
Department of Education that a principal cannot delegate the
responsibility for ensuring the information contained in a
student's record is true and correct; that of 45 student
transcripts from Amite County High School introduced by the
District, none were kept in accordance with SDE regulations,
including unexplained handwritten grade changes; and that Floyd
had certified for graduation no fewer than eleven students who had
not taken the required courses and hence were not eligible to
graduate, which the witness described as representing a
"pervasive[,] [massive] pattern [of] this type of error."  Based
on the evidence introduced at the hearing, the Court of Appeals
determined that "Floyd essentially 'rubber-stamped' students'
records, certifying them for graduation without taking the time to
verify the accuracy or the completeness of the records."  Based on
what the court described as "[a] wealth of evidence . . . showing
the deplorable condition of the records at the Amite County High
School," the court concluded "the board was clearly within its
rights to discharge a principal under whose watch these conditions
flourished."

[9]    The court cited evidence that Floyd inexplicably delayed
creation of a master schedule and offered only minimal assistance
in preparing a schedule, as a result of which the schedule was not
completed at the beginning of the school year.  One teacher
described the start of the school year as "chaotic," and stated
there were "numerous errors, delays and changes of schedules" that
lasted six to eight weeks into the school year.

given for his termination.[10]  For example, he does not dispute that

it was his responsibility as principal to have student schedules

ready in a timely manner and to ensure their accuracy; this was

not done.  Floyd admits that there were errors in student records,

and that as the principal who signed off on the records, it was

his responsibility to ensure their accuracy.  Floyd also does not

dispute that these were legitimate reasons for which he could have

been terminated.  He maintains, though, that despite the Court of

Appeals' affirmation that his termination was supported by

adequate grounds, the evidence clearly demonstrates that these

grounds were nothing more than pretext and that the underlying

impetus and reason for his removal as principal of ACHS was racial

(and/or retaliatory) animus.

     "A plaintiff may establish pretext 'by showing that a

discriminatory motive more likely motivated' [his] employer's

decision, such as through evidence of disparate treatment, 'or

that [her employer's] explanation is [false or] unworthy of

credence.'"  Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 220

(5th Cir. 2001) (citations omitted).  In the case at bar, Floyd has

_____

     [10]    Floyd points out that the Court of Appeals only affirmed
three of the six grounds cited by Russ for Floyd's termination.
However, to carry his burden to show pretext, a plaintiff must
rebut each nondiscriminatory or nonretaliatory reason articulated
by the employer.  Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir.
2003) (citing Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 220
(5th Cir. 2001), cert. denied, 535 U.S. 1078, 122 S. Ct. 1961, 152
L. Ed. 2d 1022 (2002)).

undertaken to establish pretext with what he contends is evidence tending to show both disparate treatment and that defendants' proffered reasons are "unworthy of credence." In the court's opinion, his evidence is insufficient.

Floyd points out that in response to the discovery of inaccuracies in student records, Russ took no action against any of the other individuals (teachers or counselors) who actually changed the grades on the transcripts; instead, he was the only one disciplined. Similarly, Floyd argues that he was the only one disciplined for the tobacco policy even though Charles Jackson, as the high school disciplinarian, primarily enforced it. And he argues that while the guidance counselor shared responsibility with him for completing student schedules, the guidance counselor was never disciplined for any perceived problems with the schedules, nor were any teachers or data processors involved in the scheduling issues disciplined; only he was disciplined. He submits that this evidence of disparate treatment tends to show that he was singled out and targeted for discriminatory or retaliatory reasons.

A plaintiff seeking to show pretext through assertions of disparate treatment must show that similarly situated employees outside the protected class were purportedly treated more favorably under nearly identical circumstances. See Earle v. Aramark Corp., No. 06-10483, 2007 WL 2683821, at *2 (5th Cir.

Sept. 12, 2007) (cited in <u>Taylor v. CSC Applied Technologies, LLC</u>, Civil Action No. 1:06CV134-B-A, 2007 WL 3120271, 4 (N.D. Miss. Oct. 23, 2007); <u>Garcia v. Radiology Assocs. of San Antonio</u>, Civil Action No. SA-06-CA-294-XR, 2007 WL 2048836, 6 (W.D. Tex. July 12, 2007) (to establish pretext through evidence of disparate treatment, "a plaintiff must show that the employer gave 'preferential treatment' to another employee under nearly identical circumstances; that is, the misconduct for which the plaintiff was discharged must have been nearly identical to that engaged in by other employees who received favorable treatment'"). (citing <u>Okoye v. Univ. of Tex. Houston Health Sci. Ctr.</u>, 245 F.3d 507, 514 (5th Cir. 2001)).  Floyd has not identified a single similarly situated employee who was treated more favorably than he under "nearly identical circumstances."  The fact is, while there were others at ACHS who were involved in the grade inaccuracies, the failure to timely prepare student schedules and the imposition of tobacco fines, Floyd, alone, was the principal, and he, as principal, was ultimately responsible for the proper operation of the school.[11]

---

[11]   In a related vein, Floyd has claimed that Floyd's predecessor as principal, Taplin, was appointed to replace him as principal notwithstanding that defendants were aware that Taplin had also signed off on student records containing grade inaccuracies when Taplin had served as principal.  In support of this assertion, Floyd cites testimony of Board member Burns. However, Burns did not testify that the Board members were aware of this fact at the time Taplin was hired; rather, he testified that this was learned in the course of the subsequent

Floyd has also attempted to show that the reasons given by defendants for his termination are false or unworthy of credence.

> An explanation is false or unworthy of credence if it is not the real reason for the employment action. "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination [or retaliation] even without further evidence of the defendant's true motive." No further evidence of discriminatory animus is required because "once the employer's justification has been eliminated, discrimination [or retaliation] may well be the most likely alternative explanation.'" As the Supreme Court explained in <u>Reeves [v. Sanderson Plumbing Prods., Inc.</u>,]
>
>> the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.
>
> [530 U.S. 133, 147, 120 S. Ct. 2097](internal quotation marks and citations omitted); <u>see also</u> [<u>Gee v. Principi</u>, 289 F.3d 342, 348 (5th Cir. 2002)] (applying <u>Reeves</u> to a Title VII retaliation claim and noting "that a factfinder may infer the ultimate fact of retaliation from the falsity of the explanation").

<u>Staten</u>, 187 Fed. Appx. at 357-358, 2006 WL 1737438, at 5; <u>see also</u>

<u>Evans v. City of Bishop</u>, 238 F.3d 586, 592 (5th Cir. 2000)

(holding that "evidence of the prima facie case plus pretext may,

and usually does, establish sufficient evidence for a jury to find

---

investigation.

Floyd also claims that while there had always been problems with student schedules, no prior principal had ever been subject to disciplinary action. Yet he has presented no evidence that prior scheduling problems had been of the magnitude of those experienced under his administration.

discrimination").[12]  To raise an inference of pretext in this way,
"the plaintiff must undermine the employer's credibility to the
point that a reasonable jury could not find in its favor.'"
Staten, 187 Fed. Appx. at 361, 2006 WL 1737438, at 9 (qoting
Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1310 (10th Cir.
2005)).  "In other words, the plaintiff must present evidence so
'that a jury could find that the employer (or its decisionmaker)
*lacks all credibility*.'"   Id. (citing Jaramillo).

     In support of his charge that the defendants' articulation of
the reasons for his termination are unworthy of credence, Floyd
relies on a variety of circumstances.  Floyd points to the School
Board's adoption in June 2002 of a so-called "dual position
policy" which prohibited him from serving as both principal and
coach, and claims that the "mysterious" and suspicious timing and
alleged purpose of the Board's adoption of this policy suggest the
Board implemented the policy to force him out as principal because
he had allowed the white private school students to use the ACHS
track.  He claims that Russ, Davis and Williams were responsible

---

     [12]   Plaintiff notes that a plaintiff can establish pretext
by proof that the employer has offered inconsistent explanations
for the challenged employment action, which tends to show that the
employer's proffered explanation is unworthy of credence.  See
Staten, 187 Fed. Appx. at 359, 2006 WL 1737438, at 7 ("When an
employer offers inconsistent explanations for its employment
decision at different times, as here, the jury may infer that the
employer's proffered reasons are pretextual.").  Yet the record in
this case belies plaintiff's insinuation that defendants have
given inconsistent reasons for firing him.

for this policy, and that these defendants, anticipating that he
would choose to relinquish his position as principal, had already
contacted and negotiated with Percetta Tuggle to replace him as
principal.  He posits that when he surprised everyone by choosing
to remain as principal, Russ, Davis and Williams had to find some
other way to get rid of him, and so began collecting evidence to
support a campaign to remove him as ACHS principal.  He claims,
for example, that when an inquiry was forwarded from Ole Miss
concerning the accuracy of a particular student's transcript, Russ
seized the opportunity.  According to Floyd, rather than
undertaking an objective investigation of student records, she
handpicked student transcripts of Floyd's track students for
review, hoping to prove that Floyd was responsible for changing
grades; and when such proof did not materialize, she decided to
hold him responsible for other people's errors and/or misdeeds.
He further claims that Davis recruited the parents of a student,
Tyrone Thompson, who had been subject to the $75 tobacco fine, to
appear before the Board and complain about the tobacco policy that
Floyd was enforcing, notwithstanding that the fine on this
particular student had been imposed and paid during the fall of
the *previous* school year.  Floyd asserts that Davis persuaded
Thompson's parents to challenge the year-old fine at the same
Board meeting at which Floyd was suspended for improper

25

enforcement of fines for violation of the District's tobacco policy.

In the court's opinion, one could not reasonably conclude from the evidence of record that the School Board adopted and implemented the dual position policy as a means of forcing Floyd from his position as ACHS principal.  The minutes for the June 13, 2002 Board meeting at which the dual position policy was presented and adopted recite that a motion was made by defendant Williams, and seconded by Board member King, to approve a letter "written and read by Mr. Williams" to restrict administrators from holding more than one position in our district, such as coaching and administration."  The letter, which was signed by each of the Board members, was directed to "All Amite County School District Administrators," and recited that "[a]s a consequence of the new requirements for accountability, the [AMSD] requests that all administrators accept and have only one position in our district. Effective, June 13, 2002, dual positions such as coaching/ administration will no longer be acceptable."  The Board voted unanimously to approve the "dual position policy."  Floyd submits that defendants "have no reasonable consistent explanation for implementing the 'dual position' policy in close proximity to Coach Floyd's inclusion of white private school student athletes in his summer track program," that they have no reasonable consistent explanation of the purpose for adopting the policy, and

they have no explanation as to the origin of the policy, from all of which a jury could reasonably find the circumstances indicative of pretext, particularly when one considers that the only person adversely affected by the policy was Floyd.

While there is nothing in the record to explain the timing of the Board's adoption of the dual position policy, i.e., why the policy was presented and adopted in June 2002, in close proximity to Coach Floyd's having included white students in the track program, it is nevertheless apparent that the policy against administrators was not something contrived by Russ or the Board or individual Board members to get rid of Coach Floyd.[13]   The record establishes that the policy against holding dual positions emanated from the State Department of Education.  All the Board

_____

[13]     There is nothing in the record to show whose idea it was to present the issue at the June 12 Board meeting.  While the Board minutes recite that the letter embodying the policy was "written and read" by Williams, Williams denies that he wrote the letter.  Russ testified that she had not seen the letter before the Board meeting, though she acknowledged at some time preceding that Board meeting (i.e., in the spring of 2002), she had discussed the subject of a dual position policy with the State Board of Education and that she did favor such a policy.  Although Board member Kirchfield testified that he favored the policy because it was in accordance with State accreditation requirements, the letter presented at the Board meeting did not come from him; he assumed it came from Mary Russ.  The District has stated that it does not know who prepared the letter that was presented by Williams at the June 12 Board meeting.  And there is otherwise nothing in the record to show who prepared the letter or whose idea it was to raise the issue at that particular time.  The fact that no one has claimed responsibility for the decision to present the dual position policy for consideration does not support an inference of pretext.

members were informed of the policy when they attended the annual conference of the Mississippi School Boards Association in February 2002, at which adoption of the dual position policy was advocated.  Moreover, Russ testified at Floyd's due process hearing that she had been informed that the State Department of Education did not allow administrative personnel to hold two positions; she also indicated that she had understood from former superintendent Bobby Whittington that the principal (Floyd) was not to hold dual positions after the 2001-02 school year.  The fact that the Board did not vote to adopt the policy immediately upon returning from the conference, and that the matter was not formally presented for a vote until a few months later, does not suggest an ulterior motive for the policy, notwithstanding that the vote on the policy happened to occur in temporal proximity to the appearance of white students at the ACHS track.

Furthermore, while Floyd argues that defendants' inconsistent explanations as to the purpose of the policy are suggestive of pretext, in the court's opinion, to the extent that any explanations have been offered, they do not appear inconsistent. The letter embodying the policy approved by the Board recited that the policy was "a consequence of the new requirements for accountability."  Russ testified that she understood this to refer to accountability standards under the "No Child Left Behind" law, which standards relate to student/school performance.  Davis

28

testified that he was concerned with the level of performance of the District's schools, including ACHS, and supported the policy for that reason.  The fact that other Board members testified that they favored the policy because it was required by the State Department of Education is not inconsistent with these explanations.

Floyd also argues that the dual position policy tends to show pretext because he was the only person adversely affected by the policy.  In support of this argument, Floyd states that the only two people who were affected by the dual position policy were he and Augusta Russ (Mary Russ's brother, who was both the Director of the ACHS Vo-Tech Center and the baseball coach).  Floyd claims that although Augusta Russ was also affected by the policy (a fact he admits would seem to belie his claim that defendants were targeting him), according to Floyd, Augusta Russ was not *adversely* affected by the policy; rather, Augusta Russ was not having much success with the baseball program, and thus was "eager to give up his duties as baseball coach."  The evidence does not support Floyd's hypothesis.  Floyd's position is contradicted by Augusta Russ's testimony, in which he indicated that he would have liked to continue coaching baseball.  But even if that were not true, there is no evidence to show that Mary Russ or any of the Board members knew that Augusta Russ would not have been *adversely* affected by the dual position policy; that is, there is nothing to

suggest they knew he did not care whether he continued in both

positions.[14]  The fact is, the dual position policy was a District-

wide policy that was intended to apply across the board to all

administrator-coaches (present and future) in the District.

Finally, Floyd claims further that before the Board

implemented the dual position policy and before he had made his

election to remain as principal, defendants, anticipating that he

would give up his principal position, had already hired Percetta

Tuggle to replace him as principal.  He submits that when he

surprised everyone by choosing to remain as principal, defendants

were forced to create a new position for Tuggle and hired her as

---

[14]     The court would note that plaintiff's theory regarding
this issue has not been consistent in any event.  While Floyd does
vigorously argue that defendants adopted the dual position policy
to get rid of him as principal, he has also suggested that Mary
Russ wanted to get rid of him as the track coach so that her
brother, Augusta Russ, would have an easier time recruiting
players for the baseball team.  Floyd has claimed that because of
his own success in recruiting students for the track team, Augusta
Russ had a difficult time recruiting players for the baseball
team, and so Augusta Russ influenced his sister to get rid of
Floyd as the track coach.  As Floyd put it in his deposition, he
believes Augusta Russ "sicced" Mary Russ on him.  Of course if
this were true, that would mean the dual position policy was not a
pretext for discrimination or retaliation against Floyd but rather
was a way for Russ to help her brother in his job as baseball
coach.
     In this vein, Floyd asserts that "Augusta Russ even expressed
his discontentment of Coach Floyd at a campaign rally for Mary
Russ where he proclaimed Coach Floyd should be removed while the
opportunity existed."  A review of Floyd's testimony cited as
support for this allegation indicates that Augusta Russ made no
statement about getting rid of Floyd; rather, he allegedly
referred to getting rid of the "rattlesnakes." Floyd assumed this
meant him, yet there is nothing to show that Russ was referring to
Floyd, other than Floyd's personal belief.

Parent Center Director and Coordinator during the July 11, 2002 board meeting.  He claims that by that time, Tuggle had already given up her job in Hinds County and had moved to Amite County to take over as principal of ACHS.  Floyd argues that this evidence "certainly creates an issue regarding whether defendants anticipated Coach Floyd would relinquish his principal duties, and based thereon, had already negotiated with Tuggle to serve as principal of [ACHS]."  The fact is, however, there is no record evidence to support Floyd's assertion that Tuggle was hired prior to June 13, 2002.  The only evidence addressing the question of when Tuggle was hired is the testimony of Mary Russ that she first interviewed Tuggle in late June or early July; Tuggle's testimony that she was hired in the summer of 2002;[15] and minutes of the July 11, 2002 Board meeting at which the Board voted to hire Tuggle as Parent Center Director and Coordinator.

In sum, Floyd's evidence is insufficient to support an inference that defendants' legitimate, nondiscriminatory/ nonretaliatory explanation of the Board's adoption of the dual position policy is false or "unworthy of credence."  Certainly he has not shown that the explanation "lacks all credibility."

---

[15]    Contrary to Floyd's representation of the evidence, Tuggle did not testify that she had quit her previous employment in June 2002 to take a job in Amite County.  Tuggle testified that she had been performing three different jobs simultaneously and that the grant funding for one of those positions ran out in June 2002; she did not say when she left her other positions.

Nor has Floyd presented sufficient evidence to create an issue for trial on his allegation that defendants Russ, Davis and Williams, having proven unsuccessful in forcing him to resign as principal under the dual position policy, embarked on a campaign to remove him as ACHS principal.

The evidence shows that the investigation of student records which ultimately was one basis for Floyd's termination, did not begin of Mary Russ's own initiative. Rather, her investigation was prompted, initially, by an inquiry from Ole Miss about the accuracy of the records of a particular student athlete. The fact that Russ did not confine her investigation to that one student's records, and that she instead extended her investigation to the records of other students (even if she began her investigation by looking at other student athletes), cannot reasonably be found to support a conclusion that Russ's investigation was part of an effort to terminate Floyd as principal. The accuracy of student records is a serious matter, and having been challenged as to one student, warranted further investigation. Indisputably, the investigation revealed a "pervasive[,] [massive] pattern" of errors, for which Floyd, as principal, was ultimately responsible.

Floyd's claim that defendant Davis recruited Tyrone Thompson's parents to complain to the School Board about their son's year-old tobacco fine is unsupported by the evidence. Floyd points out that Mr. Thompson worked with defendant Davis, and that

the Thompsons, Mary Russ and defendant Davis were all members of
the Masonic Lodge, where they socialized.  Building on these
relationships, he suggests that the fact of the Thompsons' having
asked the School Board to consider a refund of the $75 tobacco
fine they had paid more than a year before at the very same Board
meeting that Mary Russ proposed to suspend Floyd for, among other
things, improperly imposing fines, is highly suspicious--too
suspicious to be merely coincidental--and that the more likely
explanation is that Russ and Davis asked the Thompsons to complain
to the Board to give them more ammunition against him.  However,
the Thompsons have insisted this did not occur.

Mrs. Thompson has testified that while at a campaign meeting
for Mary Russ, some people were discussing the tobacco fine and
saying that it was not proper, and so she and her husband decided
*on their own* to seek a refund of the $75 they had paid for their
son's fine the previous school year.  Mr. Thompson testified that
he asked Davis what he needed to do, and Davis simply told him
that if he had a problem with the school or the school system, he
needed to go to the School Board.  Mr. Thompson denied that either
Russ or Davis prompted him to write a letter complaining of the
$75 fine for his son's tobacco violation, or that either
encouraged him to attend the Board meeting to bring up the issue.
He testified that he may have spoken with Russ about the issue,
but claimed that he and his wife made the decision to pursue the

issue without input or encouragement from anyone.  Unlike the Thompsons' affirmative testimony, Floyd's suspicions about the Thompsons' actions are not proof, and they cannot create a triable issue on pretext.

Floyd cites a variety of other alleged facts and identifies what he describes as "hearing issues" which he claims tend to show pretext, but the court, having considered the record in its entirety, and having evaluated the facts as to which there is competent evidence in the light most favorable to Floyd, concludes that Floyd has not presented evidence sufficient to support a finding that defendants' professed reasons for his termination were not its true reasons.  Furthermore, plaintiff has not presented evidence sufficient to create a triable issue on his claim that Floyd's having allowed white students to use the ACHS track was "a motivating factor" in the decision to terminate him as principal.  Accordingly, the court concludes that Floyd cannot prevail on his Title VII or any putative § 1981 claim.

Breach of Contract

In addition to his federal claim(s), Floyd has asserted a number of state law claims.  Among these is a claim for breach of his employment contract with the District.  Under Mississippi law, which is incorporated in Floyd's employment contract, dismissal of certificated school employees is governed by Miss Code Ann.

§ 37-9-59, which provides, in pertinent part, that "[f]or incompetence, neglect of duty, immoral conduct, intemperance, brutal treatment of a pupil or other good cause the superintendent of schools may dismiss or suspend any licensed employee in any school district."  Floyd cannot prevail on his breach of contract claim as the evidence establishes beyond dispute that there was "good cause" for his termination, and Floyd has not shown that the reasons which constitute good cause for his termination were not, in fact, the reasons for which he was terminated.

<u>Defamation</u>

Floyd has charged a claim for defamation based on the reasons cited for his termination in the letters of suspension and termination, which were reported in local newspapers. Defendants argue that this claim is time barred because Floyd did not file suit within one year of publication of the statement(s). <u>See</u> Miss. Code Ann. § 15-1-35 (establishing one-year statute of limitations for defamation).  In response to defendants' motion, Floyd has identified a single alleged defamatory statement as the basis for his cause of action, a statement appearing in a local newspaper article by David Bruser, which recited, "A source close to the situation says Floyd is accused of fixing grades of students in an attempt to get them admitted to the University of Mississippi."  While an action for defamation "accrues at the time of the first publication for public consumption," <u>McCorkle v.</u>

35

McCorkle, 811 So. 2d 258, 265 (Miss. Ct. App. 2001), and this
article appeared well over a year before Floyd filed suit, Floyd
argues that the statute of limitations was tolled by the discovery
rule which applies in libel cases where, "because of the secretive
or inherently undiscoverable nature of the publication the
plaintiff did not know, or with reasonable diligence could not
have discovered, that he had been defamed." Id. Floyd claims he
has been unable to identify the source of the defamatory statement
because the reporter who wrote the article, David Bruser, would
not reveal his source for the statement and he had no other means
(aside from discovery after suit was filed) to identify the source
of the statement. He argues further that the doctrine of
fraudulent concealment applies to toll the statute of limitations
because defendants have failed to disclose the origination of the
statement, despite Floyd's having sought this information from
them. Finally, he argues that while defendants contend otherwise,
the fact that he still has not been able to identify the
individual who made the defamatory statement to Bruser does not
preclude his cause of action because "sufficient evidence has
created an issue of whether the defamatory statement originated
with the Board." Specifically, he submits that defendant Williams
has testified that the statement at issue was made while the Board
was in executive session, and thus, was either made by someone who

36

was in executive session or someone who overheard the comment in executive session.

In fact, however, Williams did not testify that this statement was made in executive session. Rather, he testified that all discussions by the Board concerning Floyd's suspension and termination were made by the Board in executive session. He denied that any such statement was made in executive session, and maintains that he made no such statement. Russ and Davis testified similarly. The fact is, plaintiff has no evidence to show that a defendant made the alleged defamatory statement; this lack of evidence is fatal to his claim.

Intentional Infliction of Emotional Distress

Defendants initially moved for summary judgment on this claim on the basis of the one-year statute of limitations applicable to claims for intentional infliction of emotional distress,[16] citing deposition testimony by Floyd to the effect that this claim was based solely on the accusations against him in the suspension and termination letters, both of which were sent to him more than a year prior to the date on which suit was filed. In response to defendants' motion, Floyd argues that his claim is not as limited as defendants suppose, but is premised on "all the circumstances

---

[16]    See Miss. Code Ann. § 15-1-35 (establishing one-year limitations period for certain intentional torts); CitiFinancial Mortg. Co., Inc. v. Washington, 967 So. 2d 16 (Miss. 2007) ("A claim for intentional infliction of emotional distress is subject to a one-year statute of limitations.").

leading to the destruction of his career as an educator,"
including not only the alleged "false accusations" asserted
against him as the basis for his suspension and termination, but
also the conspiracy to terminate him for racial reasons and "his
termination and affirmation by the school board" on the basis of
race.  He further argues that defendants' conduct amounts to a
continuing tort, especially in light of his allegation of an
ongoing conspiracy.

This court need not resolve whether plaintiff's claim for
intentional infliction of emotional distress is time barred as
plaintiff cannot succeed on the claim, even if it was timely
filed.  Under Mississippi law, a party may recover for intentional
infliction of emotional distress "where there is something about
the defendant's conduct which evokes outrage or revulsion."
Franklin Collection Serv., Inc. v. Kyle, 955 So.2d 284, 290 (Miss.
2007).  "The standard is whether the defendant's behavior is
malicious, intentional, willful, wanton, grossly careless,
indifferent or reckless."  Id. at 290-91.  Floyd's claim is
grounded on his charge that defendants conspired to terminate him
for racial reasons.  A claim for intentional infliction of
emotional distress will not ordinarily lie for mere employment
disputes, see Pegues v. Emerson Elec. Co., 913 F. Supp. 976, 982
(N.D. Miss. 1996); yet the Mississippi Supreme Court has found a
claim for intentional infliction of emotional distress based on

discriminatory conduct, including highly offensive racial slurs by a supervisor, to be actionable. See Jones v. Fluor Daniel Services Corp., 959 So. 2d 1044 (Miss. 2007) (statement to group of black workers that "you monkeys can go to work or go to the rope" was "patently a racial slur constituting outrageous and revolting conduct"). Here, pretermitting consideration of whether plaintiff's *allegations* of discrimination would support a cause of action for intentional infliction of emotional distress, the court concludes that plaintiff cannot succeed on this claim because he has failed to present sufficient proof to create an issue for trial on his claim for race discrimination. He has not shown that this case involves anything more than a typical employment dispute.

Negligent Infliction of Emotional Distress

Under Mississippi law, "a plaintiff ... may not recover emotional distress damages resulting from ordinary negligence without proving some sort of physical manifestation of injury or demonstrable physical harm." American Bankers' Ins. Co. of Fla. v. Wells, 819 So. 2d 1196, 1209 (Miss. 2001). The Mississippi Supreme Court has stressed that "[m]ental anguish is a nebulous concept ... and requires substantial proof for recovery." Summers v. St. Andrew's Episcopal Sch., Inc., 759 So. 2d 1203, 1211 (Miss. 2000) (citing Morrison v. Means, 680 So. 2d 803, 805 (Miss. 1996)). In this case, the alleged physical manifestations

39

described by Floyd are not the types of injuries that satisfy the requirement of "physical manifestation of injury."  Floyd asserts he exhibited numerous physical manifestations: he had nightmares and difficultly sleeping, was shaky, agitated, angry and upset.  However, the Mississippi Supreme Court has stated repeatedly that "testimony regarding sleeplessness and nightmares is insufficient to support an instruction or award of damages for emotional distress."  <u>Illinois Cent. R. Co. v. Hawkins</u>, 830 So. 2d 1162, 1174 (Miss. 2002).  Moreover, in the court's opinion, the Mississippi Supreme Court would likewise conclude that testimony that Floyd was agitated, shaky, angry and upset would not suffice either.

<u>Conspiracy</u>

Under Mississippi law, "'[a] conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully.'"  <u>Gallagher Bassett Services, Inc. v. Jeffcoat</u>, 887 So. 2d 777, 786 (Miss. 2004) (quoting <u>Levens v. Campbell</u>, 733 So. 2d 753, 761 (Miss. 1999)).  "It is elementary that a conspiracy requires an agreement between the co-conspirators."  <u>Id</u>.  <u>See</u> <u>Brown v. State</u>, 796 So. 2d 223, 226–27 (Miss. 2001) (conspiracy is "a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy," and the "persons must agree ... in order for a

40

conspiracy to exist"). Although he insists otherwise, it is clear to the court that Floyd has presented no proof that would support a reasonable finding of a conspiracy among Russ, Davis and Williams.

<u>Trespass to Chattels</u>

Floyd's claim for trespass to chattels is based on an allegation that Mary Russ destroyed or disposed of Floyd's personal belongings which remained in his office following his suspension and termination. However, there is no evidence that any defendant was involved in the destruction or disposal of Floyd's property. Rather, the evidence cited by Floyd is to the effect that Percetta Tuggle--not Russ or any other defendant--threw away Floyd's personal items; and there is nothing to suggest that she did so at the direction of any defendant.

<u>Interference with Contract</u>

"One who intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for pecuniary loss resulting to the other from the failure of the third person to perform the contract." <u>Liston v. Home Ins. Co.</u>, 659 F. Supp. 276, 280 (S.D. Miss. 1986). Defendants seek summary judgment on Floyd's claim for intentional interference with contract based on the principle that one cannot "interfere" with his or her own

41

contract.  As the Mississippi Supreme Court explained in <u>Cenac v.</u>
<u>Murray</u>,

> a cause of action (for interference) exists by a party
> to a contract against some third, outside person who
> causes the party not to perform.  Thus, in order to
> pursue a cause of action, it is accepted that the
> wrongdoer is a "stranger" to the contract which was
> interfered with–an outsider.  "A party to a contract
> cannot be charged with interfering with his own
> contract."

609 So. 2d 1257, 1269 (Miss. 1992) (citations omitted).  As

defendants were parties to Floyd's employment contract, they

cannot be held liable for interfering with that contract.

Accordingly, defendants are entitled to summary judgment on this

claim.

### Conclusion

Based on the foregoing, it is ordered that defendants' motion

for summary judgment is granted.

A separate judgment will be entered in accordance with Rule

58 of the Federal Rules of Civil Procedure.

SO ORDERED this 28th day of July, 2008.


                              /s/ Tom S. Lee
                              UNITED STATES DISTRICT JUDGE